[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**
**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**December 6, 2005**
**THOMAS K. KAHN**
**CLERK**

_____

No. 04-11077

_____

D. C. Docket No. 02-00061-CV-1-DHB

HOOTERS OF AUGUSTA, INC.,
SAM NICHOLSON, and all other persons
or entities similarly situated,

Plaintiffs-Appellees,

versus

AMERICAN GLOBAL INSURANCE COMPANY,

Defendant-Appellant,

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

**(December 6, 2005)**

Before EDMONDSON, Chief Judge, MARCUS and PRYOR, Circuit Judges.

PER CURIAM:

American Global Insurance Co. ("American Global") appeals from a final order of summary judgment entered in favor of Hooters of Augusta, Inc., ("Hooters") in a dispute over an umbrella liability policy. At issue is whether the insurance policy's coverage of "advertising injury" obligates American Global to pay amounts levied against Hooters for sending unsolicited fax advertisements in violation of the federal Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

The district court concluded that Georgia principles of contract interpretation compel viewing the fax advertising as a "publication" that violated "a person's right to privacy" for purposes of the policy's advertising-injury coverage. After thorough review, we agree with the district court and accordingly affirm its summary judgment order. However, we also find that the district court erred when it ordered American Global to pay post-judgment interest on Hooters's outstanding liability, and therefore vacate the portion of the judgment that ordered American Global to pay post-judgment interest and remand for further proceedings consistent with this opinion.

I.

The essential facts and procedural history are these: In 1995, Hooters purchased advertising space on weekly flyers faxed to a database of Augusta

2

businesses. Sam Nicholson, an Augusta attorney, received one of the faxed copies of Hooters's advertisement. On June 23, 1995, Nicholson sued Hooters and sought class certification in the Superior Court of Richmond County, Georgia; the court granted class certification. The Nicholson class's suit sought damages under the TCPA, which, as codified at the time, made it unlawful "to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine," 47 U.S.C. § 227(b)(1)(C) (2000) (amended 2005),[1] and provided a private right of action for violations of the Act, id. §

---

[1]The relevant portion of the statute reads:

(b) Restrictions on use of automated telephone equipment

    (1) Prohibitions

        It shall be unlawful for any person within the United States –

        (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice –

            (i) to any emergency telephone line (including any "911" line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency);

            (ii) to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

            (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call;

3

227(b)(3).[2]

On March 21, 2001, after trial, a jury returned a verdict against Hooters for knowingly and willfully violating the TCPA, and on April 25, 2001, the trial judge entered judgment against Hooters in the amount of $11,889,000, calculated

---

> (B) to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by rule or order by the Commission under paragraph (2)(B);
>
> (C) to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine; or
>
> (D) to use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously.

. . .
47 U.S.C. § 227(b) (2000) (amended 2003 and 2005).

[2]The statute also provides:

(3) Private right of action

> A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State—
>
> (A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,
>
> (B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or
>
> (C) both such actions.
>
> If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

47 U.S.C. § 227(b)(3) (2000).

4

according to statutory damages of $500 for each violation and trebled as allowed by the TCPA. Hooters appealed the verdict, but soon thereafter, Hooters and Nicholson, on behalf of the class, entered into a settlement agreement that lowered Hooters's liability to $9 million. In exchange, Hooters promised to drop its appeal of the state court judgment, file a declaratory judgment action against American Global and Zurich Insurance Company, and assign its claims against the insurance carriers to the Nicholson class on request. The Superior Court approved the settlement, and the first act in this extended litigation drama ended.

Hooters then brought this action against Zurich, American Global, and the Nicholson class in the Superior Court of Richmond County, Georgia. Zurich and American Global timely removed the cause to the U.S. District Court for the Southern District of Georgia based on diversity of citizenship. The district court realigned the parties, designating the Nicholson class as a plaintiff, and denied Hooters's motion for remand. Both Hooters and the Nicholson class separately moved for summary judgment, and the defendants jointly filed a motion for summary judgment as well.

The district court granted summary judgment in favor of Hooters and the Nicholson class and entered final judgment in the amount of $5 million– –the coverage amount provided for in the insurance policy– –and post-judgment interest

on the $6.45 million unpaid balance of Hooters's settlement. American Global appealed both the grant of summary judgment and the award of post-judgment interest.

II.

We review a grant of summary judgment de novo, viewing the materials presented and drawing all factual inferences in the light most favorable to the non-moving party. See, e.g., Gerling Global Reinsurance Corp. of Am. v. Gallagher, 267 F.3d 1228, 1233–34 (11th Cir. 2001). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant bears the burden of demonstrating that this standard is satisfied by presenting "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that establish the absence of any genuine, material factual dispute. Id.

The primary issue in the case is whether the amounts Hooters owes the Nicholson class for their TCPA claims fit within the insurance policy's coverage for "Advertising Injury," defined in part as harm from "[o]ral or written publication of material that violates a person's right of privacy."[3] The district court

_____

[3]The coverage provision of the policy states:

6

concluded that Georgia rules of contract interpretation favored reading the policy broadly to cover the TCPA claims. The district court determined that the TCPA's protections against unsolicited faxes amount to a "right of privacy" within the meaning of the advertising-injury provision.

The text of the policy and the language of the TCPA resolve these issues in favor of coverage when read in light of controlling Georgia law. Both parties agree that Georgia law governs the dispute. It is by now axiomatic that Georgia law

---

I. Coverage

> We will pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay by reason of liability imposed by law or assumed by the Insured under an Insured Contract because of Bodily Injury, Property Damage, Personal Injury or Advertising Injury that takes place during the Policy Period and is caused by an Occurrence happening anywhere in the world. . . .

American Global Insurance Company Policy at 1.

> "Advertising Injury" is defined later:

IV. Definitions

> A. Advertising Injury means injury arising solely out of your advertising activities as a result of one or more of the following offenses:
>
> > 1. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services;
> >
> > 2. Oral or written publication of material that violates a person's right of privacy;
> >
> > 3. Misappropriation of advertising ideas or style of doing business; or
> >
> > 4. Infringement of copyright, title or slogan.

Id. at 3.

7

directs courts interpreting insurance policies to ascertain the intention of the parties by examining the contract as a whole. Ryan v. State Farm Mut. Auto. Ins. Co., 413 S.E.2d 705, 707 (Ga. 1992) (citing James v. Pennsylvania General Insurance Co., 306 S.E.2d 422, 425 (Ga. Ct. App. 1983)). A reviewing court must consider the ordinary and legal meaning of the words employed in the insurance contract. Id. Moreover, Georgia law teaches, ambiguous terms in the policy must be construed in favor of the insured to provide maximum coverage, id., and when reasonable, a court should read an insurance contract "as a layman would read it and not as it might be analyzed by an insurance expert or an attorney," Cont'l Ins. Co. v. Am. Motorist Ins. Co., 542 S.E.2d 607, 610 (Ga. Ct. App. 2000) (quoting Jefferson Insurance Co. of New York v. Dunn, 482 S.E.2d 383, 388 (Ga. Ct. App. 1997), rev'd on other grounds, 496 S.E.2d 696 (Ga. 1998)) (internal quotation marks omitted). These rules reflect Georgia's judgment that the insurer, as the party with greater control over the wording of terms in the policy, should bear the burden of laying out the terms clearly and precisely. See James, 306 S.E.2d at 431.

American Global first argues that Hooters's conduct violated no right of "privacy" because a fax sent in violation of the TCPA would not constitute a common-law tort for invasion of privacy under Georgia law. American Global's reading  may be one reasonable interpretation, but, undeniably, it is at least as

8

reasonable to interpret "privacy" more broadly to include aspects of privacy protected by other sources of law, including state privacy statutes and federal law. Indeed, the statutory notion of being free from intrusive and unsolicited facsimile transmissions is at least arguably embodied in the common law right to privacy under Georgia law. An essential element of the right to privacy, Georgia's courts have recognized, is "the right 'to be let alone,'" or "the right to seclusion or solitude." Yarbray v. S. Bell Tel. & Tel. Co., 409 S.E.2d 835, 836–37 (Ga. 1991). Notably, the insurance policy contains no language explicitly limiting the scope of the term "privacy" or, for that matter, alerting non-expert policyholders that coverage depends on the source of law underlying the relevant privacy right. Following the Georgia rule and interpreting ambiguous terms in favor of the insured, we are constrained to reject American Global's suggestion that its construction of the meaning of privacy is the only reasonable one under Georgia law, as opposed to a broader interpretation that encompasses violations of privacy rights established by federal statutes such as the TCPA. We are hard pressed to say that a layman could not reasonably read the notion of privacy as broadly as the district court did.

American Global also suggests that the TCPA provisions at issue do not create a statutory right of privacy, although the statute plainly creates a statutory

9

right to be free from intrusions by unsolicited faxed or telephonic advertising. While it acknowledges, as it must, that the statute at least partly aims at protecting some privacy interests, American Global argues that the section governing unsolicited faxes is concerned only with the commercial impact of unsolicited faxes, not with privacy. In support of its position, American Global says that only a small portion of the legislative record suggests that unsolicited faxes violate privacy.

It is worth noting that the legislative record does indeed contain suggestions that Congress thought of unsolicited faxes as akin to intrusive telephone calls. See, e.g., H.R. Rep. 102-317, at 5–6 (1991) ("The purpose of the bill (H.R. 1304) is to protect residential telephone subscriber privacy rights by restricting certain commercial solicitation and advertising uses of the telephone and related telecommunications equipment. . . . H.R. 1304 is designed to return a measure of control to both individual residential telephone customers and owners of facsimile machines."). Indeed, the findings accompanying the TCPA legislation illustrate that Congress was expressly concerned about protecting privacy interests, including privacy interests in places of business. See, e.g., Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(9), 105 Stat. 2394, 2394 ("Individuals' privacy rights, public safety interests, and commercial freedoms of speech and

10

trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices."); id. §2(14) ("Businesses also have complained to the Congress and the Federal Communications Commission that automated or prerecorded telephone calls are a nuisance, are an invasion of privacy, and interfere with interstate commerce.").

We refuse, however, to allow the TCPA's legislative history to sway us too far in either direction. Whether Congress intended the provisions against unsolicited faxes to protect "privacy," and how much that intention factored into the passage of the law, is not relevant today. Georgia law unambiguously directs us to search for the intentions of the parties to this insurance contract, not the intentions of distant federal lawmakers. We therefore must consider the ordinary meaning of the term "privacy," not whatever specialized meaning the word may have taken on in the context of the TCPA.

After thorough review, we are satisfied that the term "privacy" can be reasonably read as extending beyond a particular, narrow and more technical definition of privacy and encompassing a broader layperson's notion of privacy as protected by various provisions of state or federal law. Following the Georgia courts' practice of interpreting ambiguous terms in favor of greater coverage, we conclude that facsimile transmissions in violation of the TCPA amount to

11

violations of "privacy" for the purposes of the insurance policy at issue.

Two other circuit courts of appeal appear to have reached similar conclusions when interpreting similar insurance policies. Recently, the Eighth Circuit held that a Missouri insurance policy that covered "private nuisance" and "invasion of rights of privacy" covered unsolicited faxes in violation of the TCPA. Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc., 401 F.3d 876, 881, 883 (8th Cir. 2005). The insurer, the court wrote, "offers only technical and restricted legal definitions to support its position that violations of the Act are neither 'private nuisances' nor 'invasions of privacy.' Under Missouri law, we cannot restrict the undefined terms in such a manner." Id. at 882.

The Fifth Circuit also appears to have reached a similar conclusion. A district court in the Northern District of Texas found that unsolicited faxes amounted to "publication of material that violates a person's right of privacy" within the meaning of a commercial liability policy. W. Rim. Inv. Advisors, Inc. v. Gulf Ins. Co., 269 F. Supp. 2d 836, 847 (2003), aff'd per curiam, 96 F.Appx. 960 (5th Cir. 2004). A panel of the Fifth Circuit issued an unpublished per curiam opinion affirming the judgment for "essentially the reasons stated by the district court." Western Rim, 96 F. Appx. at 960 (per curiam).

American Global nevertheless contends that the Fifth Circuit's decision in

Western Rim is distinguishable because it concerned a duty to defend against suit, not the issue of the insurer's ultimate liability. The Eighth Circuit case similarly involved a duty to defend. But nothing in either opinion suggests that either court's decision turned on the possibility that the lawsuits at issue could have proceeded under alternative theories. Indeed, in each of the two cases, advertising injury in the form of TCPA violations was the only theory that the court considered and found capable of triggering the duty to defend. Universal Underwriters, 401 F.3d at 881–83; Western Rim, 269 F. Supp. 2d at 842–50.

American Global claims, however, that even if the TCPA protects privacy rights, the insurance contract's reference to "oral or written publication of material that violates a person's right to privacy" does not cover Hooters's conduct because there was no act of "publication." American Global first says that an intrusion into the private sphere fundamentally contradicts the very notion of "publication," which suggests a public act of dissemination of information. This argument simply conflates two distinct perspectives. The act of transmitting an unsolicited fax indeed involves a public act by the sender. But the act is thought to violate the recipient's privacy. There is no contradiction. The conduct by which Hooters was found to violate the TCPA, and for which it now seeks coverage under the insurance policy, is using a fax machine "to send an unsolicited advertisement."

13

American Global also argues that we should interpret the term "publication" in a narrow, legal sense, as an element of three privacy-related torts: public disclosure of private facts, portrayal of a plaintiff in a false light, and misappropriation. As we have noted, though, Georgia law suggests that a reviewing court must consider both the ordinary and legal meanings of a term in an insurance contract and, when faced with ambiguity, adopt the interpretation that favors greater coverage. While it may be reasonable to read the terms "publication" and "privacy" in a technical legal sense, it is at least equally plausible to read both terms in their ordinary non-technical sense. Plainly, Georgia law directs us to adopt the interpretation that favors greater coverage.

Hooters's conduct amounted to an act of "publication" in the ordinary sense of the word. American Global cites three definitions of the term "publish" found in Webster's Ninth New Collegiate Dictionary: "to make generally known," "to make public announcement," and "to place before the public: disseminate."[4] Webster's Ninth New Collegiate Dictionary 952 (1984). Hooters purchased advertising space on weekly fliers disseminated by fax to nearly 8,000 businesses. This course of

---

[4]The definition reads:

> publish . . . 1 a: to make generally known b: to make public announcement of 2 a: to place before the public : disseminate b: to produce or release for publication; specif : print c : to issue the work of (an author) . . . .

> Webster's Ninth New Collegiate Dictionary 952 (1984).

14

conduct squarely fits at least the third of American Global's definitions and arguably fits the other two as well. Notably, the dictionary that American Global cites also includes a fourth definition of "publish" not mentioned in the appellants' brief: "to produce or release for publication; specif[ically] : print." Id. Hooters's conduct fits this definition even more closely.

As we have noted, our conclusion is altogether consonant with the conclusions reached by the Fifth and Eighth Circuits in interpreting similar insurance policies. Our conclusion differs, however, from decisions rendered by the Seventh and Fourth Circuits, which have interpreted similar advertising-injury provisions as extending only to a particular species of privacy violation– – violations of a right to secrecy of personal information, not intrusions into a private domain. Res. Bankshares Corp. v. St. Paul Mercury Ins. Corp., 407 F.3d 631, 640–41 (4th Cir. 2005); Am. States Ins. Co. v. Capital Assocs. of Jackson County, Inc., 392 F.3d 939, 942–43 (7th Cir. 2004).

We do not need to discuss the Seventh and Fourth Circuit opinions at length, since American Global does not contend that the insurance contract's reference to "violations of privacy" does not encompass intrusions into a person's private domain. Rather, American Global's argument is that a violation of the TCPA is not the kind of intrusion into seclusion that the policy covers. See Brief of Appellant at

15

31 ("The only means . . . by which Nicholson could have established a violation of privacy in the context of facsimile transmissions was under the concept of an 'intrusion into seclusion.'"); id. at 37 ("[T]he parties and the district court agreed that the only 'privacy' interest arguably violated by the receipt of unauthorized facsimiles was the result of <u>intrusion</u> into the recipient's affairs."). Because the chief aim in contract interpretation is to discern and implement the intent of the parties, we decline to lend the contract a meaning that neither party has suggested it has.

There are, however, additional reasons for distinguishing the Seventh and Fourth Circuit cases from this one. The Fourth Circuit case was decided under Virginia law, <u>Resource Bankshares</u>, 407 F.3d at 636; the Seventh Circuit case, under Illinois law, <u>American States</u>, 392 F.3d at 943. In addition, the Fourth Circuit case involved a more tightly worded advertising-injury provision that described the covered activity as "making known to any person or organization written or spoken material that violates a person's right to privacy." <u>Resource Bankshares</u>, 407 F.3d at 641. This wording seems to have been a significant factor in the court's decision. <u>See</u> id. at 641–42. The insurance contract in this case, however, refers to "[o]ral or written publication" of such material, which does not suggest the focus on secrecy that "making known" does.

16

American Global also argues that the insurance policy was restricted to amounts identified as "damages" and that a statutory award under the TCPA does not amount to "damages" within the meaning of the policy. The district court correctly rejected this argument, too, noting that the policy refers to "sums . . . that the Insured becomes legally obligated to pay by reason of liability imposed by law or assumed by the Insured," without excluding statutory penalties.[5] American Global points to several policy provisions referring to "damages" rather than "sums." These provisions, however, do not purport to narrow the insurer's initial obligation to pay "sums."

Even if we were to read the word "damages" more narrowly than the word "sums," the most natural way to read the policy would be to assume that the policy intends the narrower meaning only when it actually employs the term "damages." For example, the provision specifying that "damages that arise from the same or related injurious material or act" fall within the same "Occurrence" would only affect the allocation of "damages" among "Occurrences," without affecting the allocation of sums other than "damages," and certainly without affecting the base

[5]At trial, American Global also cited a policy exclusion for advertising injury "arising out of the willful violation of a penal statute or ordinance." The district court found that the TCPA was a remedial statute, not a penal statute, and that the exclusion therefore did not apply. 272 F. Supp. 2d at 1376. American Global has not challenged this ruling on appeal, so we have no occasion to review it.

17

obligation to pay "sums."

Finally, American Global cites Endorsement No. 4, a "Publishing Liability Exclusion" that excludes "Personal Injury or Advertising Injury arising out of the utterance or dissemination of matter published by or on behalf of the Insured." American Global argues that the endorsement, which took effect at the same time as the main policy, excludes any advertising injury claim related to publishing-related activities, including the fax campaign.

Read as broadly as American Global suggests, however, the endorsement would completely wipe out the policy's coverage of advertising injury, since no readily conceivable advertising activity could take place without publishing activities. It is not absolutely clear how Georgia law looks upon such an endorsement. American Global argues that Georgia law would grant the exclusionary endorsement precedence over conflicting terms in the policy, as it would do with an endorsement adopted at a later time, see Utica Mut. Ins. Co. v. Dunn, 129 S.E.2d 94, 96 (Ga. Ct. App. 1962) (holding that an endorsement adopted at a later date takes precedence over the original policy terms because it reflects a later expression of intent). Not surprisingly, Hooters argues that we should treat the endorsement as equal with the conflicting terms in the policy and follow the Georgia rule holding that "where one provision of the policy excludes

18

liability and another accepts liability . . . the provision most favorable to the insured will be applied," Welch v. Gulf Ins. Co., 190 S.E.2d 101, 103 (Ga. Ct. App. 1972).

When an endorsement is entered at the same moment as the policy it accompanies, rather than at a later time, and the endorsement purports to obliterate coverage, as opposed to merely clarifying, narrowing, or modifying the terms of coverage, we believe the approach more consistent with Georgia law is to read the endorsement and the terms of the policy as being coequal and thus to enforce the provision that grants coverage. Georgia rules of contract interpretation aim to protect purchasers of insurance from misleading contracts by placing the burden on the insurer to draft the insurance contract clearly. See James v. Pa. Gen. Ins. Co., 306 S.E.2d 422, 431 (Ga. Ct. App. 1983) ("Since insurance policies are contracts of adhesion penned by the insurer, when ambiguity is present, construction of the policy is in favor of the insured, although it must not be unreasonable or strained.") (quoting Imperial Enterprises, Inc. v. Fireman's Fund Insurance Co., 535 F.2d 287, 290 (5th Cir. 1972)) (internal quotation marks omitted); Alley v. Great Am. Ins. Co., 287 S.E.2d 613, 616 (Ga. Ct. App. 1981) ("Exceptions, limitations and exclusions to insuring agreements require a narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises,

19

assumes a duty to define any limitations on that coverage in clear and explicit terms.") (quoting Krug v. Millers' Mut. Ins. Ass'n of Ill., 495 P.2d 949, 954 (Kan. 1972)) (internal quotation marks omitted). Through the lens of this state policy, granting coverage and simultaneously sweeping it away through another provision entered at the same time seems to pose the same risk to the purchaser regardless of whether the exclusion clause appears within the insurance policy itself or within an endorsement. We add that American Global has offered no alternative reading of the publishing exclusion that excludes coverage for violations of the TCPA but does not go as far as wiping out all coverage for advertising injury.

In short, because under Georgia law the policy's coverage of advertising injury applied to Hooters's liabilities under the TCPA and was not nullified by Endorsement No. 4, we affirm the district court's order granting final summary judgment in favor of Hooters and the Nicholson class.

III.

We conclude, however, that the district court erred when it found that the insurance contract requires American Global to pay post-judgment interest on Hooters's liability, and we vacate the portion of the district court's judgment that awarded post-judgment interest.

The contract terms specifically mentioning post-judgment interest appear

20

under a section titled "Defense." The policy provides that when American Global "assume[s] the defense of any claim or suit," American Global will pay "all interest that accrues after entry of judgment and before we have paid, offered to pay or deposited in court the part of the judgment that is within our applicable Limit of Insurance." American Global Insurance Company Policy at 1–2. The structure and language of the policy thus suggest that American Global took on an obligation to pay post-judgment interest only when it assumed the defense of the associated claim.

The district court, however, reasoned that this post-judgment interest provision could not be reconciled with the general coverage provision obligating American Global to pay "those sums . . . that the Insured becomes legally obligated to pay by reason of liability imposed by law." The district court decided to interpret the contract in favor of coverage by giving precedence to the coverage provision and effectively disregarding the post-judgment interest provision. Hooters of Augusta, Inc. v. Am. Global. Ins. Co., CV102-061, at 3–4 (S.D. Ga. 2004).

We disagree with the district court's approach. Georgia law favors an interpretation that gives effect to all provisions if such an interpretation is possible. Boardman Petroleum, Inc. v. Federated Mut. Ins. Co., 498 S.E.2d 492, 494 (Ga.

21

1988) ("The contract is to be considered as a whole and each provision is to be given effect and interpreted so as to harmonize with the others.") (citing McCann v. Glynn Lumber Co., 34 S.E.2d 839, 843 (Ga. 1945)). Disregarding provisions in the contract should be a last resort.

A harmonious interpretation of the contract provisions is not only possible but reasonable in this case. Both the provisions of the contract have effect if we interpret the coverage provision as broadly establishing American Global's general obligations to cover Hooters's liabilities and interpret the post-judgment interest provision as more specifically controlling the scope of American Global's obligation to pay post-judgment interest. This approach also better comports with the principle that in cases of apparent conflict, specific terms in a contract should be interpreted to control general terms. See, e.g., Cent. Ga. Elec. Membership Corp. v. Ga. Power Co., 121 S.E.2d 644, 646 (Ga. 1961); Broome v. Allstate Ins. Co., 241 S.E.2d 34, 35 (Ga. Ct. App. 1977).

Georgia law thus favors interpreting the contract as imposing a duty to pay post-judgment interest only when American Global took on the defense of the associated claim. Because American Global did not defend Hooters from the Nicholson class's initial claim, American Global had an obligation to pay post-judgment interest only if it had a duty to defend the claim and simply failed to

22

satisfy that duty.

We are convinced that American Global never had a duty to defend the claim. The first part of the "Defense" section reads as follows:

II. Defense

A. <u>We [American Global] shall have the right and duty to defend any claim or suit seeking damages</u> covered by the terms and conditions of this policy when:

1. <u>The applicable Limits of Insurance of the underlying policies listed in the Schedule of Underlying Insurance and the Limits of Insurance of any other underlying insurance providing coverage to the Insured have been exhausted by payment of claims</u> to which this policy applies; or

2. Damages are sought for Bodily Injury, Property Damage, Personal Injury or Advertising Injury covered by this policy but not covered by any underlying insurance listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the Insured.

American Global Insurance Policy at 1 (emphasis added).

The insurance contract thus specified that American Global assumed an obligation to defend Hooters only after Hooters's primary coverage was exhausted. When Hooters's primary coverage was exhausted, it had already settled its dispute with the Nicholson class and terminated its appeal. American Global's contractual duty to defend therefore never materialized. Because American Global never had a duty to defend Hooters against the Nicholson class claim, it could not have had a

23

duty to pay post-judgment interest.

IV.

Having carefully reviewed the record, the district court's opinion, and the arguments of the parties, we conclude that the district court committed no error when it found that the advertising-injury provisions of the insurance contract provide coverage for amounts owed for TCPA violations. We therefore affirm the entry of summary judgment in favor of Hooters and the Nicholson class. However, the district court erred when it ruled that the insurance contract required American Global to pay post-judgment interest on all of Hooters's outstanding liability.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.